FILED
CLERK, U.S. DISTRICT COURT
06/05/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___E.C.___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 25- 8:25-cr-00101-SRM |
|---|---|
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 1956(h): Money Laundering Conspiracy; 18 U.S.C. § 982: Criminal Forfeiture] |
| DANNA KANG,<br>  aka "Eillen Kang,"<br>  aka "Eillen Jung Kang," | |
| Defendant. | |

The United States Attorney charges:

[18 U.S.C. § 1956(h)]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

1. Defendant DANNA KANG, also known as "Eillen Kang" and "Eillen Jung Kang," was a resident of Orange County, California.

2. Cross River Bank; Citibank, N.A. ("Citibank"); Opus Bank/Pacific Premier Bank ("Opus Bank"); and Bank of the West ("BofW") were each a federally insured financial institution.

The Paycheck Protection Program

3. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or about March 2020 that

was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic. One form of assistance provided by the CARES Act was the authorization of United States taxpayer funds in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

4.  In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the small business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. One such certification required the applicant to affirm that "[t]he [PPP loan] funds w[ould] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments." The applicant (through its authorized representative) was also required to acknowledge that "I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges." In the PPP loan application, the applicant was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, the applicant was required to provide documentation showing its payroll expenses.

5.  A business's PPP loan application was received and processed, in the first instance, by a participating financial institution. If a PPP loan application was approved, the

participating financial institution would fund the PPP loan using its own monies.

6.   PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expenses within a designated period of time and used at least a minimum amount of the PPP loan proceeds towards payroll expenses.

<u>The Economic Injury Disaster Loan Program</u>

7.   The Economic Injury Disaster Loan Program ("EIDL") was a United States Small Business Administration ("SBA") program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

8.   The CARES Act authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

9.   To obtain an EIDL loan, a qualifying business was required to submit an application to the SBA and provide information about the business's operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDL loans for COVID-19 relief, the 12-month period was the 12-month period from January 31, 2019, to January 31, 2020. The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

3

10. EIDL loan applications were submitted directly to the SBA and processed by the agency with support from a government contractor. The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the applicant about employment, revenue, and cost of goods sold, as described in paragraph 15 above. Any funds issued under an EIDL loan were issued directly by the SBA.

11. EIDL loan funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtained a loan under the PPP, the EIDL loan funds could not be used for the same purpose as the PPP loan funds.

B.   THE OBJECTS OF THE CONSPIRACY

12. Beginning no later than in or around May 2020 and continuing until at least in or around October 2021, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, defendant KANG conspired with others known and unknown, to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit:

   a. to knowingly conduct and attempt to conduct a financial transaction involving the proceeds of specified unlawful activity, that is, wire fraud and bank fraud, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

   b. to knowingly engage and attempt to engage in monetary transactions in criminally derived property of a value greater than

$10,000, such property having been derived from a specified unlawful activity, that is, bank and wire fraud, in violation of Title 18, United States Code, Section 1957.

C.    THE MANNER AND MEANS OF THE CONSPIRACY

13.    The objects of the conspiracy were carried out, and to be carried out, as follows:

a.    Co-conspirators submitted and caused the submission of fraudulent PPP and EIDL loan applications, which caused the SBA and SBA-approved lenders, including lenders that were federally insured financial institutions, to wire loan proceeds to bank accounts in the names of the entities used to obtain such loans.

b.    Defendant KANG, together with other conspirators, transferred and caused the transfer of the loan proceeds, including in financial transactions of $10,000 or more, to other accounts under her control, including accounts in the names of business entities to which she had no relationship and/or which had no business relationship to the loan recipients, in order to conceal the true nature, location, source, ownership, and control of the funds.

c.    Defendant KANG, together with other conspirators, spent the PPP and EIDL fraud proceeds for their own personal benefit and for the benefit of their coconspirators, including for expenses prohibited under the requirements of the PPP and EIDL programs, such as the purchase of Residential Property 1.

D.    OVERT ACTS

14.    In furtherance of the conspiracy, and to accomplish its objects, defendant KANG, on or about the following dates, committed and willfully caused others to commit the following overt acts, among others, within the Central District of California and elsewhere:

<u>Overt Act No. 1</u>:   On May 12, 2020, coconspirators caused Cross River Bank to deposit via interstate wire the proceeds of a PPP loan issued to Amaryllis Group Inc., approximately $102,500, into Citibank account X2748, which defendant KANG had opened and controlled.

<u>Overt Act No. 2</u>:   On May 13, 2020, defendant KANG wrote check numbers 1140, 1141, 1142 and 1144 for $3,950, $12,978, $12,122, and $3,500, respectively, and made payable to coconspirators on Citibank account X2748.

<u>Overt Act No. 3</u>:   On May 15, 2020, defendant KANG opened Opus Bank account X7472 in the name of Beyond Cutting Inc., falsely identifying herself as the Chief Executive Officer of the company.

<u>Overt Act No. 4</u>:   On May 29, 2020, defendant KANG directed a family member to open Opus Bank account X6986 in the name of MGMT Plus, Inc.

<u>Overt Act No. 5</u>:   On June 17, 2020, coconspirators submitted and caused to be submitted to the SBA an application in the name of Beyond Cutting Inc. seeking an EIDL loan in the amount of approximately $150,000, which application: (a) falsely represented that Beyond Cutting Inc. had 6 employees, including employees for whom it had paid wages and payroll taxes; and (b) falsely certified that Beyond Cutting Inc. would use the loan proceeds for permissible purposes.

<u>Overt Act No. 6</u>:   On June 24, 2020, coconspirators submitted an EIDL loan application to the SBA that falsely stated that MGMT Plus, Inc., had 9 employees and monthly revenue of $122,000.

<u>Overt Act No. 7</u>:   On June 30, 2020, defendant KANG, together with other coconspirators, caused the SBA to wire approximately $149,900 to the Opus Bank account X7472.

<u>Overt Act No. 8</u>:   On July 1, 2020, defendant KANG deposited check number 1022 drawn on the Opus Bank account X7472 $13,762 into her US Metro Account X3025.

<u>Overt Act No. 9</u>:   On July 2, 2020, defendant KANG deposited check numbers 1025 and 1028 drawn on the Opus Bank X7472 Account for $15,500 and $10,000, respectively, into her personal checking account, namely, BofW account X9006, and her US Metro Account X3025, respectively.

<u>Overt Act No. 10</u>:   On July 7, 2020, coconspirators caused SBA to wire the proceeds of the EIDL loan issued as a result of the application described in Overt Act 6 – namely, $149,900 -- to be wired into Opus Bank account X6986.

<u>Overt Act No. 11</u>:   On July 8, 2020, defendant KANG wired $20,600 from the Opus Bank account X6986 to BofW account X8648 which defendant KANG had opened in 2018 the name of Rica LLC DBA Best Plaza DBA EJK Town DBA Sofi DBA Sarinotex and controlled.

<u>Overt Act No. 12</u>:   On August 20, 2020, defendant KANG transferred $34,893 from the BofW account X8648 to BofW account X9006.  This transfer included $20,600 from the EIDL loan issued to MGMT Plus, Inc., and $9,229 from the EIDL loan issued to Extra Sensory Protection & Limo LLC.

<u>Overt Act No. 13</u>:   On September 2, 2020, defendant KANG transferred $35,00 from BofW account X8648 to BofW account X9006. This transfer included $10,537 from the EIDL loan issued to Extra Sensory Protection & Limo LLC.

<u>Overt Act No. 14</u>:   On October 20, 2020, defendant purchased the $250,000 cashier's check for Prime One Escrow using funds from the BofW X9006 account that included approximately $47,145 from the

7

1  fraudulently obtained EIDL loans issued to Extra Sensory Protection &
2  Limo LLC and MGMT Plus, Inc.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FORFEITURE ALLEGATION

[18 U.S.C. § 982]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), in the event of the defendant's conviction of the offenses set forth in the single count of this Information.

2. The defendant, if so convicted, shall forfeit to the United States of America the following:

(a) Any property, real or personal, involved in such offense, and any property traceable to such property; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), the defendant, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty. Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the

course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000.00 or more in any twelve-month period.

BILAL A. ESSAYLI
United States Attorney

*Christina Shay* (signature)

CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division

DAVID R. FRIEDMAN
Assistant United States Attorney
Chief, Criminal Appeals Section

RANEE A. KATZENSTEIN
Assistant United States Attorney
Criminal Appeals Section