TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
RANEE A. KATZENSTEIN (Cal. Bar No. 187111)
Assistant United States Attorney
Acting Deputy Chief, Criminal Appeals Section
     1000 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2432
     Facsimile: (213) 894-6269
     E-mail:    ranee.katzenstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>DANNA KANG,<br>  aka "Eillen Kang,"<br>  aka "Eillen Jung Kang,"<br><br>          Defendant. | No. CR 25-101-SRM<br><br><u>GOVERNMENT'S SENTENCING POSITION</u><br><u>FOR DEFENDANT DANNA KANG</u><br><br>Hearing Date: April 15, 2026<br>Hearing Time: 10:30 a.m.<br>Location:     Courtroom of the<br>              Hon. Serena R.<br>              Murillo |

     Plaintiff United States of America, by and through its counsel of record, hereby files its sentencing position for defendant DANNA KANG.

     This sentencing position is based on the attached memorandum of points and authorities; the Presentence Investigation Report ("PSR")

///

///

///

///

Disclosed on October 15, 2025, and revised on November 10, 2025; the file and record in this case; and such further evidence and argument as the Court may permit.

Dated: April 1, 2026          Respectfully submitted,

TODD BLANCHE
Deputy Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division


/s/ *Ranee A. Katzenstein*
RANEE A. KATZENSTEIN
Assistant United States Attorney
Deputy Chief, Criminal Appeals Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Congress, through the CARES Act, provided over $650 billion to aid small businesses by offsetting the massive adverse economic impact of the COVID-19 pandemic. The CARES Act provided for the bulk of that money to be distributed through forgivable Paycheck Protection Program ("PPP") loans and Economic Injury Disaster Loans ("EIDL") to be used for specific business purposes, *e.g.*, payroll and normal operating expenses.  The U.S. Small Business Administration ("SBA") administered the PPP program, which began on April 3, 2020. The PPP loans were made through SBA-certified banks, which were responsible for verifying the applicant's eligibility as declared on the loan application, and were guaranteed by the SBA. Upon a proper showing, the SBA would authorize forgiveness of a loan and reimburse the lending bank.  The SBA directly funded the EIDL loans, which were not forgivable.

Two associates of defendant turned the PPP and EIDL loan programs into their personal piggybank, submitting fraudulent applications for the loans, which they then did not pay back.  While defendant did not participate in the application process, she assisted in laundering the fraudulently obtained loan proceeds by opening bank accounts in the names of the applicant businesses, moving the loan proceeds among multiple accounts, and comingling the proceeds with other monies, thereby hiding the nature and source of the fraudulently obtained loan proceeds.

Defendant distributed some of the money she laundered to the associates; she also took over $2 million of the money for herself

and for her benefit by writing checks to herself and her family members, withdrawing cash and using the money to pay for her personal expenses and debts.

Defendant's crime facilitated the theft of significant sums of public money that was intended to help people and businesses suffering from the impact of the COVID-19 pandemic. Her conduct was serious and calls for a sanction that will promote respect for the law and afford adequate general deterrence. That said, it is also true that defendant has no prior criminal history and the need for specific deterrence is low given her immediate agreement to plead guilty and accept responsibility for her offense, to cooperate, and to sell her residence and make a substantial payment towards restitution right away. Weighing these mitigating and aggravating factors, the government requests the Court depart/vary from the otherwise applicable advisory Sentencing Guidelines range of 57-71 months and impose a sentence of 24 months' custody, three years' supervised release, and restitution of $2,068,272.  The government's reasons for this requested sentence are set forth more fully below.

**II.   STATEMENT OF FACTS**

Defendant has pleaded guilty to Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. 1956(h) (CR 30)[1], and admitted — both in the plea agreement (CR 5) and at the hearing on her change of plea — an extensive statement of facts in support of her guilty plea.  The admitted facts include the following overview of defendant's offense conduct:

---

[1] "CR" refers to the Clerk's Record of Proceedings (docket) and is followed by the applicable entry number. "PSR" refers to the Amended Presentence Report prepared by the Probation Officer (CR 33) and is followed by the applicable paragraph numbers.

In or about 2014, defendant met Taegue ("Terry") Choi and his brother Jeff Choi and entered into various business arrangements with them. In connection with these arrangements and at the Chois' direction, defendant opened multiple bank accounts in the names of companies with which defendant had no affiliation and into which the Chois would deposit and cause to be deposited large sums of money. The Chois told defendant that they were unable to open bank accounts themselves because they had been "black-listed."

Defendant knew that some of the bank accounts she had opened at the direction of the Chois were being used to receive the proceeds of loans issued to the named account-holder companies.  These loans were provided by federally insured banks and the U.S. Small Business Administration ("SBA") via interstate wires and included government funded and backed loans that had been authorized to alleviate the financial harms caused by the COVID-19 pandemic, namely, the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan program ("EIDL").  Defendant knew that, because she was not a principal of or affiliated in any way with the named account-holder companies, the loan applications directing the deposit of the loan proceeds into bank accounts in those companies' names which she in fact controlled were fraudulent.

Nonetheless, knowing that these loan proceeds were fraudulently obtained and that she was not entitled to any of this money, defendant took steps, sometimes at the

3

direction of the Chois, to hide the nature and source of the money by moving it via checks she wrote on the accounts among multiple bank accounts and mingling it with other money.  Defendant distributed some of the money to the Chois; she also took some of the money for herself and for her benefit by writing checks to herself and her family members, withdrawing cash and using the money to pay for her personal expenses and debts.

In total, in furtherance of the conspiracy, defendant opened and caused to be opened at least 20 bank accounts and used these accounts to engage in transactions designed to conceal the source and nature of fraudulently obtained loan proceeds totaling approximately $4,551,262 million. Defendant transferred to herself, her family members or her creditors approximately $2,068,272 of these laundered funds.

(CR 5, Exh. B (Statement of Facts); CR 30 (Change of Plea Hearing); PSR ¶¶ 14-17.)  Defendant also admitted conducting specific transactions with the fraudulently obtained loan proceeds in furtherance of the money laundering conspiracy, namely:

- Transactions in account number X2748 opened in the name of Amaryllis Group, Inc., DBA Shopcom co., DBA Jam Ball ("Amaryllis"), at Citibank, N.A., into which PPP loan proceeds in the amount of approximately $102,500 and EIDL advance and loan proceeds of approximately $159,900 had been deposited;

4

- Transactions in account X7472 opened in the name of Beyond Cutting Inc. at Opus Bank/Pacific Premier Bank, into which EIDL loan proceeds of approximately $149,900 had been deposited; and

- Transactions in Citibank Account X5257, opened in the name of Art-C, which held $8,560 from an EIDL loan issued to Beyond Cutting and $18,400 from an EIDL loan issued to Opera Red Corporation, and into which defendant transferred $139,000 from the Amaryllis EIDL loan.

(CR 5, Exh. B; CR 30; PSR ¶¶ 16-24.)  Defendant also admitted using at least $47,145 that can be traced to fraudulently obtained EIDL loans issued to Extra Sensory Protection & Limo LLC, MGMT Plus, to partially fund one of the cashier's checks used to purchase a residential property at 1241 West Valencia Mesa Drive, Fullerton, California. (CR 5, Exh. B; CR 30; PSR ¶¶ 25-35.)

**III. RESPONSE TO THE PRESENTENCE REPORT**

The government agrees with the findings of the PSR except as follows:

In paragraphs 42 through 49 of the PSR, the Probation Officer calculates a base offense of 30 based on the following Sentencing Guidelines provisions:

USSG § 2S1.1(a)(2) [base offense level 8 plus 18-level increase pursuant to USSG § 2B1.1 because the funds laundered were greater than $3.5 million];

USSG § 2S1.1(b)(2) [adding 2 levels because the conviction was under 18 U.S.C. § 1956]; and

USSG § 2S1.1(b)(3) [adding 2 levels because the laundering was sophisticated.

In the plea agreement, the parties cited the same Sentencing Guidelines provisions but calculated, and stipulated to, a base offense level of 29. (CR 5 ¶ 21.) This was an arithmetical error. Because all of the relevant Guidelines provisions provide for even-numbered amounts, 29 is not a possible sum under any circumstances. That said, the government stands by the stipulation in the plea agreement and asks this Court to set a base offense level of 29.

**IV. GOVERNMENT'S SENTENCING POSITION**

**A. Sentencing Guidelines**

1. Base offense level

As noted above, and consistent with the plea agreement, the government submits that Sentencing Guidelines calculation should begin with 8 and add 18 levels because the funds laundered exceeded $3.5 million, pursuant to USSG § 2S1.1(a)(2); and should include a 2-level enhancement for a conviction under 18 U.S.C. § 1956, pursuant to USSG § 2S1.1(b)(2) and a 2-level enhancement for sophisticated laundering, pursuant to USSG § 2S1.1(b)(3). Notwithstanding that these Guidelines total 30, the government stands by its stipulation that the erroneously calculated offense level of 29 should be the base offense level used by the Court.

2. Reductions for acceptance of responsibility and "zero-point" offender status

The government agrees with the Probation Officer that this level should be reduced by three levels for acceptance of responsibility, pursuant to USSG § 3E1.1(a), (b), and an additional two levels

6

because defendant is a "zero-point offender," pursuant to USSG § 4C1.1. (*See* PSR ¶¶ 51-54.)

### 3. No reduction for mitigating role

In the plea agreement, defendant reserved the right to argue that a mitigating role reduction in her offense level applied, pursuant to USSG § 3B1.2.  (CR 5 ¶ 21.) The Probation Officer declined to apply such a reduction (PSR ¶ 47), and rightly so. Defendant pleaded guilty to money laundering conspiracy and the central role that she played in that conduct – opening the bank accounts used to receive the loan proceeds, enlisting others to open accounts that could be so used, moving the money among various accounts, and transferring funds to herself and her associates, including the Chois – shows beyond question that she was at least as culpable, and certainly not "substantially less culpable" than "the average participant in the criminal activity." *See* USSG § 3B1.2, comment. (n.3(A)).

**B.    Defendant's Offense Level Should be Reduced Based on Defendant's Substantial Assistance**

The government hereby moves for a three-level downward departure under USSG § 5K1.1 based on defendant's provision of substantial assistance to the government.[2]  Under USSG § 5K1.1, the government may make a motion for a departure from the advisory guidelines range when "the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense."  USSG § 5K1.1.  In determining the appropriate reduction, the Court may consider (1) the significance and usefulness of the

---

[2] If the Court finds that the base offense level is 30, then the government moves for a four-level downward adjustment pursuant to USSG § 5K1.1.

defendant's assistance; (2) the truthfulness, completeness, and reliability of any information or testimony provided by defendant; (3) the nature and extent of the assistance; (4) any risks defendant incurred in providing the assistance; and (5) the timeliness of the assistance. *Id.*

Here, defendant indicated that she would cooperate with the government right away. She met with the government more than once, and answered all questions put to her by the government during the meetings. She was forthcoming, admitted her own criminal conduct and did not minimize her wrongdoing. She provided a thorough account of her conduct and her knowledge of the workings of the conspiracy. She also met with individuals suspected of criminal activity and made a covert recording of the meeting, and attempted to make recordings of other conversations with those individuals. Although not called upon by the government to testify under oath in any proceeding, defendant understood that she could be asked to do so and was willing to do so if she had been asked. And although the information defendant provided has not as yet led to any concrete results, defendant has done everything within her power to be helpful. Finally, although the government is not aware of any explicit threats made to defendant or her family, the individuals and conduct that she has described to the government are connected to a web of fraudulent transactions and the possibility of retribution from some corner should not be underestimated.

For all these reasons, the government respectfully submits that a three-level (or four-level if the circumstance described in footnote 2, above, applies) downward departure is appropriate to recognize defendant's substantial assistance to the government.

**C.    The § 3553(a) Factors Support A Downward Variance**

      1.    Nature and Circumstances of the Offense and History and Characteristics of Defendant [18 U.S.C. § 3553(a)(1)]

The CARES Act and the loan programs it funded were intended to aid the many Americans suffering economically as a result of a global pandemic.  Defendant assisted associates who were instead stealing these benefits. That defendant was willing to participate in conduct that abused programs meant for those in need demonstrates minimal respect for the law. That fact, however, is counterbalanced by defendant's law-abidance prior to the instant offense.

Defendant's history suggests that the motive for her offense was not need but – at best – opportunism, and – at worst – simple greed. (*See* PSR ¶ 17.) Defendant enjoyed a "happy" upbringing and a positive adulthood. (PSR ¶¶ 66-72.) She owned and lived in a six-bedroom home with her husband, her daughter and her daughter's family.  (PSR ¶ 71.) She has been gainfully employed since 1993, except during the Pandemic, when she made ends meet by selling left-over equipment from a former business and using credit cards. (PSR ¶¶ 90-95.)

      2.    Promoting Deterrence [18 U.S.C. § 3553(a)(2)(B)]

Defendant's history of abiding by the law and her decades of steady employment (*see* PSR ¶¶ 57-64; 90-95) suggest that defendant presents a low risk of recidivism. That suggestion is reinforced by her conduct during the investigation and prosecution of her offense. As soon as defendant learned of the investigation from a witness whom the government had interviewed, she retained counsel and contacted the government herself.  From the outset, she made clear her willingness to admit her conduct, resolve her case, and cooperate in the investigation and prosecution of others engaged in similar

9

frauds.  She also agreed to sell her residence and use the proceeds to make a substantial payment towards restitution.  This level of acceptance is unusual and deserves to be recognized by the Court.

Of course, even if specific deterrence is not a concern, the sentence imposed must also further the statutory goal of general deterrence.  Economic crimes, like defendant's laundering of fraudulently obtained loan proceeds, are "prime candidate[s] for general deterrence."  *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks omitted).  In fact, Congress, in drafting § 3553, confirmed that deterring fraud offenses was one of the driving forces for including deterrence among the goals of sentencing.  *See* S. Rep. No. 98-255, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259 ("To deter others from committing the offense . . . is particularly important in the area of white collar crime.").

### 3.    Providing Restitution [18 U.S.C. § 3553(a)(7)]

Defendant has already arranged to make a substantial payment towards restitution.  Her history of gainful employment and her demonstrated desire to address and make amends for her criminal conduct indicate that she will make payments towards any remaining restitution amount that is ordered in this case.  The government's recommended sentence of 24 months' custody followed by three years supervised release should allow defendant to continue earning funds to meet any remaining restitution obligation once she is released from custody.

10

**D.    The Government's Recommended 24-Month Sentence is Sufficient But Not More Than Necessary to Accomplish the Goals of Sentencing**

The sentence in this case must account for the harms defendant caused and the need for deterrence to prevent further thefts of public monies meant to fund programs for people in need. Nevertheless, the government submits that a sentence higher than 24 months' custody is not necessary in this case for the following reasons.

First, the sentence this Court imposes will be the first criminal justice sentence defendant has received. Being subject to formal supervision, which defendant has never experienced before, should impress on defendant the importance of conforming her conduct to, and avoiding violating, the law going forward.

Second, defendant's immediate and agreement to admit her conduct, her efforts to cooperate in investigating and prosecuting other persons defrauding the CARES Act programs, and her willingness to sell her home and use the bulk of the proceeds to make a substantial payment towards her restitution obligation, also strongly suggest that defendant understands the importance of conforming her conduct to, and avoiding violating, the law going forward, thereby reducing the need for a lengthy sentence to punish defendant and/or achieve specific deterrence.  Assuming defendant earns all the good time credits that are available, she will also complete her custodial sentence in time to earn funds to pay the amount of restitution that remains.

In sum, the recommended sentence of 24 months' custody will provide an appropriate sanction to defendant, signal to the community that there are consequences for abusing federal benefits programs

11

such as the PPP and EIDL loan programs, and address the need for restitution. The three-year period of supervised release will also afford defendant the opportunity to seek necessary programing and education to set her up for continuing success upon completion of her term.

## V.    RESTITUTION

In the plea agreement, defendant agreed that the Court may order restitution and that the amount of restitution would be approximately $2 million.  Defendant also admitted in the factual basis that she transacted approximately $4,551,262 in furtherance of the conspiracy. The government requests that the Court find that defendant's co-conspirators contributed to this loss and limit the restitution for which defendant is liable to the amount of laundered funds that defendant transferred to herself, her family members and her creditors, namely, approximately $2,068,272, pursuant to 18 U.S.C. § 3664(h).

## VI.    CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court:

(1) find that defendant's base offense level is 29;

(2) reduce that offense level by three levels for acceptance of responsibility, pursuant to USSG § 3E1.1(a), (b);

(3) further reduce the offense level by two levels because defendant is a "zero-point" offender, pursuant to USSG § 4C1.1;

(4) grant a three-level downward departure for cooperation, pursuant to USSG § 5K1.1;

(5) grant a further four-level downward variance based on the factors set forth in 18 U.S.C. § 3553(a);

12

(6) sentence defendant to 24 months, the low end of the advisory sentencing guideline range corresponding to the resulting offense level of 17; and

(7) order restitution in the amount of $2,068,272, payable to the U.S. Small Business Administration.

Dated: April 1, 2026                    Respectfully submitted,

                                        TODD BLANCH
                                        Assistant Attorney General

                                        BILAL A. ESSAYLI
                                        First Assistant United States
                                        Attorney

                                        ALEXANDER B. SCHWAB
                                        Assistant United States Attorney
                                        Acting Chief, Criminal Division


                                        _____/s/_____
                                        RANEE A. KATZENSTEIN
                                        Assistant United States Attorney
                                        Acting Deputy Chief, Criminal
                                        Appeals Section

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA